[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION TO DISMISS AND MOTION TO VACATE # 117
On December 20, 1991, the marriage of the plaintiff, Roberto Batista, and the defendant, Esther Galainena Batista (Mrs. Batista), was dissolved in Madrid, Spain. Mr. Batista currently resides in Palm Beach Florida, while Mrs. Batista resides in Spain. There are two children born of this marriage, Esther, age fifteen (15), and Carlos, age fourteen (14). Pursuant to the dissolution agreement ("the Agreement"), the parents have joint legal custody, while Mrs. Batista has physical custody, of the children. The dissolution agreement also provided, inter alia, that if the children attend school in the United States, they will spend school holidays in excess of one week in Spain with their mother.
Esther, the subject of this matter, is a freshman boarding student at the Marvelwood School in Cornwall, Connecticut. During her Spring break in March, 1992, Esther travelled to Spain in accordance with the Agreement and, upon returning therefrom, has made it clear that she does not want to go back. May 20, 1992, Affidavit of Esther Batista ("Affidavit"), Paragraphs 11, 13, 14.
Statements in Mr. Batista's affidavit indicate that he believes his ex-wife used drugs extensively, especially cocaine. May 22, 1992, Affidavit of Roberto Batista, Paragraph 11. Esther states, in her affidavit, that she is afraid of her mother. Affidavit, Paragraphs 4, 11, 13, 14, 16. She also describes a nightmarish home life in Spain in which many men visit her home and sex is encouraged by her mother. Affidavit, Paragraphs 1, 2, 8, 12. Additionally, Esther claims that she has once seen powder in her mother's nose, and that Mrs. Batista "sniffs a lot, as though her nose is running, and acts high." Affidavit, Paragraph 7. Mrs. Batista, in her affidavit, denies the preceding allegations.
Esther claims to fear her mother and her mother's friends, CT Page 5940 Affidavit, Paragraphs 2, 4, 8, 11, 13, 14, 16, and claims to contemplate suicide. Affidavit, Paragraphs 10, 14. Esther has seen Dr. Paulina Kernberg, a psychiatrist at the Cornell Medical Center in New York. May 22, 1992, Affidavit of Roberto Batista, Paragraph 16. She has also seen a psychologist in Spain for two (2) years. June 8, 1992, Affidavit of Mrs. Batista, Paragraph 17.
On May 22, 1992, the court, Susco, J., granted Mr. Batista's ex parte, request for temporary orders. The court ordered that the visitation provisions of the Agreement, as they would pertain to Esther's summer vacation, be stayed. The court also restrained the defendant from taking physical custody of Esther and extended Mr. Batista's visitation with Esther until further order. The May 22, 1992, ruling also ordered the plaintiff to file a full modification of custody action in the Spanish court within thirty (30) days. The parties have informed this court that said modification action has been filed.
The defendant has now filed a motion to dismiss and a motion to vacate the court's May 22, 1992, order. The plaintiff opposes this motion.
DISCUSSION OF LAW
The motion to dismiss is provided for in Practice Book 142-146, and is he proper manner by which to challenge the jurisdiction of the court. Practice Book 143.
The issues for this court are: (1) does this court have jurisdiction under the Uniform Child Custody Jurisdiction Act ("UCCJA") to modify custody where the parties' recent divorce decree determined custody, where the plaintiff is a Florida resident, and where the defendant and child reside in Spain? (2) If jurisdiction does exist, should this court decline jurisdiction because Spain is a more appropriate forum? (3) Should ex parte orders entered without notice and an opportunity to be heard be vacated?
The most readily disposed of issue is whether the aforementioned ex parte order entered without notice and an opportunity to be heard should be vacated. In this case, any possible problem caused by the ex parte granting of orders has been cured by the parties appearing before this court to argue their contentions. See, e.g., Wyatt v. Falshing, 396 So.2d 1069
(Ala.Civ.App. 1981); In re Custody of Thomas, 537 P.2d 1095
(Colo.App. 1975). Consequently, the motion to vacate is hereby denied.
The UCCJA is designed "to avoid jurisdictional conflicts by allowing one court in the country to determine the custody of a child. It is thus intended to discourage parental forum-shopping CT Page 5941 and to instill continuity and stability into the child's environment." Hult, "Temporary Custody Under the Uniform Child Custody Jurisdiction Act: Influence Without Modification," 48 U. Colo. L. Rev. 603, 606 (Summer, 1977) ("Temporary Custody"). See also General Statutes 46b-91(a); see also Goldstein v. Fischer,200 Conn. 197, 199 n. 1, 510 A.2d 184 (1986). All fifty states and the District of Columbia have adopted the UCCJA. 9 U.L.A. 115-16.
Pursuant to the UCCJA, the initial court retains jurisdiction for all future modifications and adjustments so long as the parties have the requisite ties to the state of that court. Temporary Custody, 606. See also UCCJA 14 and Commissioners' Note to 14; General Statutes 46b-104. "The court is selected on the basis of its access to pertinent information about the child and its family." Temporary Custody, 606 (emphasis added); General Statutes 46b-93; UCCJA 3 and Commissioners' Note to 3.
A "custody determination" is "a court decision and court orders and instructions providing for the custody of a child, including visitation rights . . . ." General Statutes 46b-92(2) (emphasis added). A "modification decree" is "a custody decree which modifies or replaces a prior decree, whether made by the court which rendered the prior decree or by another court." General Statutes 46b-92(7). Thus, as the defendant contends, for this court to make a "custody determination" or a "modification decree" pursuant to General Statutes 46b-92(2), (7), it must have jurisdiction in accordance with General Statutes 46b-93, infra.
Jurisdiction under the UCCJA is premised upon General Statutes 46b-93. That section states, in pertinent part, that:
 (a) The superior court shall have jurisdiction to make a child custody determination by initial or modification decree if . . . (3) the child is physically present in this state and . . . (B) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent . . . .
General Statutes 46b-93(a)(3)(B). General Statutes 46b-93 provides other bases for jurisdiction, as well. However, this section is the focus of the parties' contentions.
When another jurisdiction has already entered a custody decree and modification of the same is sought in this state, other sections of the UCCJA must be considered. General Statutes 46b-104 states that:
 (a) If a court of another state has made a custody decree, a court of this state shall not modify that CT Page 5942 decree unless (1) it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this chapter or has declined to assume jurisdiction to modify the decree and (2) the court of this state has jurisdiction.
General Statutes 46b-104.
This section apparently precludes courts of this state from modifying a custody decree, despite the most compelling emergency situation, if another state retains custody jurisdiction. However, this provision notwithstanding, courts have acted to prevent further abuse in a true emergency situation. See, e.g., Fry v. Ball, 544 P.2d 402 (Colo. 1975); In re Custody of Thomas, supra; Giddings v. Giddings, 228 N.W.2d 915 (N.D. 1975); Titcomb v. Superior Court, 29 P.2d 206 (Cal. 1934).
The Commissioners' Note to 46b-93(a)(3)(B) indicates that this section "`retains and reaffirms parens patriae jurisdiction . . . which a state must assume when a child is in a situation requiring immediate protection.'" Temporary Custody, 609, quoting the Commissioners' Note to UCCJA 3(a)(3). The doctrine of parens patriae has been used to change the custody of a child in emergency situations regardless of both the child's domicile elsewhere and the existence of a valid custody decree entered by another state. See, e.g., Wilson v. Wilson, 474 P.2d 789 (Colo. 1970).
Furthermore, General Statutes 46b-105, pertains to the filing and enforcement of a custody decree of another state. The Commissioners' Note to this section states that:
 `The authority to enforce an out-of-state decree does not include the power to modify it. If modification is desired, the petition must be directed to the court which has jurisdiction to modify under [General Statutes 46b-104]. This does not mean that the state of enforcement may not in an emergency stay enforcement if there is danger of serious mistreatment of the child.' (Emphasis added.)
Temporary Custody, supra, 610, quoting Commissioners' Note to UCCJA 15 (General Statutes 46b-105).
This theory was articulated in Zillmer v. Zillmer,100 N.W.2d 564 (Wis. 1960), modified, 101 N.W.2d 703 (Wis. 1960), when a mother obtained a Kansas divorce and custody decree giving her custody of the children. When she attempted to enforce the decree in Wisconsin, the paternal grandparents, who had been caring for the children while their mother was in a state mental hospital, CT Page 5943 refused to comply. The Wisconsin court heard evidence to the effect that the mother had previously attempted to kill her husband and strangle one of the children and that she was an incurable psychotic. This evidence may not have been before the Kansas court when that court issued the custody decree. Consequently, the Wisconsin Supreme Court refused to modify the Kansas decree, found that it was "`an appropriate exercise of the power of the Wisconsin court to permit the children to remain in the temporary custody of the grandparents pending [further proceedings in Kansas].'" Temporary Custody, supra, 610, quoting Zillmer, supra, 704. (Emphasis added.) The Zillmer court limited the temporary custody to sixty (60) days pending the grandparents' or father's application to the Kansas court for modification of the Kansas decree. Zillmer, supra.
While there may exist a jurisdictional basis pursuant to General Statutes 46b-93(a)(3)(B) upon which temporary custody in an emergency situation can be granted despite the fact that another court maintains custody jurisdiction, there is a more practical, and less troublesome, means by which the same result may be achieved. Temporary jurisdiction may be maintained predicated upon the court's equitable powers. See, e.g., In re Custody of Thomas, supra. In Thomas, supra, a son was visiting his father in Colorado pursuant to a Kansas custody decree. The father petitioned the Colorado courts for a change of custody from the mother to him, a Colorado resident. The father maintained that "emergency situation" jurisdiction existed pursuant to UCCJA 3(a)(3) (Connecticut General Statutes 46b-93(a)(3)(B)). In an ex parte proceeding, the court awarded the father temporary custody, pending a hearing on the merits. At said hearing, the court declined to exercise jurisdiction and returned the boy to his mother. The Court of Appeals affirmed, finding that all significant connections of the mother and child were with Kansas and, therefore, that Kansas had jurisdiction. However, the court also stated that while an allegation of an emergency situation does not confer upon the court the power to modify, it does, under the doctrine of parens patriae, confer the power to grant a temporary order to protect a child present within the state. In re Custody of Thomas, supra, 1097.
Similarly, in Fry v. Ball, supra, the father of a minor child, Scott, was in a California jail on drug charges while Scott's mother was an outpatient in a heroin addiction clinic. Scott's paternal grandmother, Ms. Gwendolyn Fry, was appointed his guardian by the Superior Court in California. All parties were, at the time, domiciliaries of California. Two years after the appointment as guardian, the grandparents moved to Colorado, and the parents subsequently filed a petition in California seeking termination of the guardianship. The court, after a hearing on the matter, terminated said guardianship, id., 404, and Scott's parents CT Page 5944 travelled to Colorado to retrieve their son. However, an altercation between the guardian and Scott's parents ensued, and Scott was not relinquished. Id., 405. Consequently, the parents were arrested and charged with assault. Id. Thereafter, the grandparents filed a petition in Colorado's courts for a determination of Scott's custody. The judge granted an ex parte order restoring physical custody to the grandparents and enjoining the parents from any further contact with Scott. Id. The parents then brought an action claiming that the UCCJA precludes modification of the California decree in Colorado's courts. Colorado's Supreme Court determined that California retained jurisdiction pursuant to UCCJA 3(a)(2) (significant connections) and held that Colorado must defer to the California court. Fry, supra, 406. More compelling to this court, however, is the Fry court's discussion of temporary custody. The court stated that although the grandparents and Scott had appeared before the California court, the Fry court:
 [F]ear[ed] that not all relevant evidence was before the Superior Court which terminated the guardianship. Specifically, we note the alleged assault upon the grandparents. Even more importantly, we call attention to the comments made by Scott to a psychologist . . . where the child expressed openly his fear that he might have to leave `with the bad guy' and not be able to stay with his grandmother. The psychologist observed the child's dependence on his grandmother, whom he called `Mom' and `Honey,' and that `reunion with the grandmother [after the interview] brought immediate relaxing and very happy spontaneous interaction.' (Emphasis added.)
Fry, supra, 407.
The Fry court continued, stating that:
 We believe that these facts might now be significant considerations for the [California] Superior Court in deciding this custody case, and that its judgment may be different if this information is presented at a new hearing. Although we reiterate our belief that the California court has continuing jurisdiction of this matter, these significant facts raise a genuine concern for Scott's welfare. We, therefore, conclude that it is proper for this court under its equity powers to permit Scott to remain in the temporary custody of [his grandmother], pending the institution and disposition of a petition addressed to the Superior Court [in California] . . . requesting a modification of its custody decree . . . . (Emphasis added.)
CT Page 5945
Id., 407-08.
The Fry court stated that if, within ten days, the guardian filed with Colorado's court written notice of her intention to petition the California court for modification, she would be granted an additional forty (40) days within which to actually file her petition for modification in California. In the event that she failed to petition, or give notice, or diligently prosecute, the court's temporary custody order would be dissolved. Id., 408.
In light of the Fry and Thomas decisions, it appears as if the court's equitable powers provide it with jurisdiction to act, for the purpose of temporary custody, without regard to another court's jurisdictional priorities. Furthermore, temporary orders do constitute a modification. See, e.g., Holt v. District Court,626 P.2d 1336, 1345-46 (Okla. 1981); 81 ALR 4th 1101, 2(a). Consequently, a temporary order would not violate the provisions of the UCCJA.
In the present case, as was the case in Fry, supra, there appears to be information before this court that might significantly impact upon the Spain court's custody determinations. Fry, supra, 407-08. Furthermore, it appears that this information was not available to Spain's court in its original determination of custody, as such information has developed subsequent to the Spain court's order. Specifically, as was noted, supra, Esther claims to fear her mother, Affidavit, Paragraphs 4, 8, 13, 14, and claims to contemplate committing suicide. Affidavit, Paragraphs 10, 14. Additionally, Esther claims to have witnessed her mother using drugs, and appears to feel threatened by both her mother's friends and her mother's comments encouraging her to engage in sexual intercourse. Affidavit, Paragraphs 2, 3, 4, 7, 8, 12.
To this court, these statements, without regard to their truthfulness, are sufficient to justify ordering temporary physical custody of Esther to Mr. Batista. The defendant rests her contentions upon the belief that there is no showing or indication of immediate harm, or threat thereof, to Esther in this state. However, Esther's statements represent her perceptions and fears and, as such, are of grave concern to this court. While the UCCJA strives to discourage parental forum-shopping and to instill continuity and stability into the child's environment, Temporary Custody, supra, 606, it fails to take into account, as fully as possible, the child's immediate physical and emotional well-being. A child's well-being is a product of her perceptions and fears and, as such, those perceptions and fears must be considered when making decisions which will affect her. Here, a fifteen year old girl has made her fears, concerns and wishes known through her affidavit. These must be considered by this court in determining what action to take. Esther's suicidal thoughts, in the opinions of this CT Page 5946 court, constitute an immediate danger to Esther. The New York Times reported on Tuesday, June 16, 1992, on an international conference on childhood suicide one week earlier sponsored by the Western Psychiatric Institute and Clinic of the University of Pittsburgh Medical Center. The conference produced statistics that suicide rates in teenagers and younger children had tripled in the last three decades. Among other findings reported were:
 Contrary to common belief, young people who talk about committing suicide are not simply venting feelings to dissipate them. Nor is it true that children who actually intend to kill themselves keep their plans to themselves. In fact, those who discuss their plans are the ones most likely to carry them out. And those who try suicide are likely to try it again and again, sometimes until they succeed, unless treatment effectively defuses their suicidal tendencies.
N.Y. Times, June 16, 1992, at C3.
The court need not make a finding of the truthfulness of the suicidal ideation articulated by Esther in her affidavit to conclude that it is imperative to hear her and assist her through a process of coming of age. She would not express these matters to a court in her school jurisdiction if she did not need a respite from the rigors of her parents' divorce and from her perceptions of what life would be like presently in her mother's home. That Esther has expressed her strong desire not to return to her mother at this time, Affidavit, Paragraphs 11, 13, 14, 16, and the fact that, as was stated, supra, this court may have information before it which was unavailable to Spain's court at the original custody proceeding, Fry, supra, 407-08, must also be considered.
Of significance to this court is Article 12 of the United Nations Convention on the Rights of the Child adopted by the General Assembly of the United Nations on November 20, 1989. It is of great concern and embarrassment that the United States of America is not a signator to that convention. This court believes that Spain is.
Article 12 reads as follows:
 1. States Parties shall assure to the child who is capable of forming his or her own views the right to express those views freely in all matters affecting the child, the views of the child being given due weight in accordance with the age and maturity of the child.
 2. For this purpose, the child shall in particular be provided the opportunity to be heard in any judicial and CT Page 5947 administrative proceedings affecting the child, either directly, or through a representative or an appropriate body, in a manner consistent with the procedural rules of national law. (Emphasis added.)
United Nations Convention on the Rights of the Child, Article 12.
After what has been described as protracted divorce proceedings and an appeal, the adult parties to this proceedings entered into an agreement of joint custody. It is not known if the court in Spain entertained the opinion of the minor children or had appointed counsel for them. What is clear at this juncture is that we hare faced with a fifteen year old child who desires to be heard. It is of critical importance that the Spanish court have access both to Esther's opinion and her presence in the Spanish court. She also has an interest in what occurs in her life. It is a life that does not belong to the adults who married and brought her into being. They do not have the exclusive right to have conflict between themselves about her as if she were a piece of personal property. Esther should not only be afforded the right to be heard, but a real opportunity to be heard in the Spanish court.
Esther's parents were awarded joint custody of their daughter. The parents' inability to resolve this situation in a manner representative of Esther's best interests leaves this court no alternative but to involve itself pursuant to its equitable powers. Additionally, Mr. Batista has informed this court that, pursuant to the previous order of the court, Susco, J., he has filed a petition in Spain's courts for a modification of custody. This court does not, and cannot, take jurisdiction over the modification proceedings, as such action would run afoul of the purpose behind the UCCJA. However, pursuant to its equitable powers, this court can, and hereby does, make the following temporary order:
1. Temporary custody of Esther is granted to her father, Mr. Batista, pending modification proceedings in Spain. Esther will be permitted to accompany Mr. Batista without restrictions on interstate travel.
2. Such custody is predicated upon Mr. Batista's efforts to place this matter before a court in Spain as expeditiously as possible in accordance with the May 22, 1992, ruling of the court, Susco, J.
3. Mr. Batista will make Esther available at the custody modification proceedings in Spain.
4. Mr. Batista will inform this court, and Mrs. Batista, of Esther's intended, and actual, location at all times. CT Page 5948
5. Esther will be permitted to communicate with her mother at any time she, Esther, so desires.
6. Any violation by Mr. Batista of this court's order will result in the dissolution, and vacating, of the same.
DRANGINIS, J.